# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# BOWLING GREEN DIVISION

**CSX TRANSPORTATION, INC.**                                                                    **PLAINTIFF**

**v.**                                                                              **NO. 1:22-CV-116-BJB**

**FRANCES L. JOHNSON GRAHAM, ET AL.**                                                          **DEFENDANTS**

\*\*\*\*\*

## ORDER GRANTING INJUNCTION

### - This Dispute -

A railroad now owned by plaintiff CSX has run through Trenton, Kentucky, for more than a century. As the track runs northwest through Todd County from Nashville to Henderson, it passes a grain silo operated by the W.F. Ware Company and, just to the east, a lot and house (currently unoccupied) owned by defendants Frances Johnson Graham and Joyce Johnson Fain. CSX agreed in 2002 to build a sidetrack alongside Ware's property to allow Ware to store and load railcars. Sidetrack Agreement (DN 12-3). And in 2017, CSX agreed to extend the sidetrack to accommodate more railcars. Trial Transcript (DN 33) 93:13–17. But the Defendants erected two "barricade" fences to block construction of the extension. Amended Complaint (DN 12) ¶ 5. This dispute concerns whether the Defendants control (per an early 20th century deed) the land where the fences sit—or whether CSX (per a 19th century statutory land grant) may force the fences to make way for the sidetrack.

When the fences appeared isn't entirely clear from the record. But they stood in the way of sidetrack construction by April 2022 at the latest.[1] That month, CSX sent Frances Johnson Graham a strongly worded letter asking the Defendants to take down the fences. Letter (DN 12-6). That letter acknowledged that the Defendants' deed described the property line as "forty feet from the center of the railroad's main line." *Id.* at 1. But CSX claimed that its "right-of-way actually extends to a distance of fifty feet from the center of the main line." *Id.* at 2. Because "sections of the fencing

---

[1] In 2017, the Estate from which Graham and Johnson inherited the property sued W.F. Ware in state court for trespass and nuisance. Amended Complaint ¶ 4. It complained of "excavations, modifications, and developments" by Ware on land purportedly owned by the Estate. *See* State-Court Motion to Dismiss (DN 12-4) at 1. Whether these earthworks related to the sidetrack remains—like so much else about this dispute's history—obscured by gaps in the record. In any event, the Todd Circuit Court dismissed the suit because the Estate wasn't a proper party. *See* Docket Sheet (DN 12-5); Trial Tr. at 7:19–8:12.

...

… begin at a point approximately only 23 feet from the center of the main line," CSX demanded that Defendants "remove the fencing and cease [their] attempts to obstruct the side track extension." *Id.*

Defendants didn't take down the fences, so CSX sued. It sought an order quieting title and expelling Defendants from the property, damages for trespass, and injunctive relief requiring "the Defendants to remove the barricade fencing and to refrain from any further activities which would interfere" with the sidetrack project. Complaint (DN 1) ¶¶ 20–42. CSX concurrently moved for a preliminary injunction compelling Defendants to remove the fences. PI Motion (DN 3).[2] Defendants answered and filed counterclaims for trespass and nuisance, Answer (DN 7), but only CSX's injunction claim matters at present.

That is because during a telephonic hearing regarding CSX's renewed motion for a preliminary injunction, the parties agreed that genuine issues of material fact prevented the Court from deciding the request on the papers. *See* DNs 22 (setting hearing), 23 (pretrial hearing). These factual questions applied equally to the requests for preliminary and permanent injunctive relief. So for the sake of efficiency and with the parties' consent, the Court scheduled a bench trial that consolidated the preliminary-injunction hearing with a trial on the merits of the injunction claim only. DN 23. This is consistent with FED. R. CIV. P. 65(a)(2): "Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." Although CSX initially requested damages, a boundary-line determination, and a prospective and retrospective injunction, by now it "just want[s] the fences down and to build the sidetrack." Trial Tr. at 24:23–24. The request for an injunction is now ripe for decision—but CSX's other relief requests and the Defendants' counterclaims are not.

After the trial, the Court afforded the parties time to negotiate an agreed resolution (DN 29), but their efforts failed. Their status report (DN 32) asked the Court to "proceed to rule on the pending motion for injunctive relief," which this Order does.

---

[2] Noting concerns about CSX's attempt to rest subject-matter jurisdiction on complete preemption under the Interstate Commerce Commission Termination Act, the Court denied without prejudice CSX's first preliminary-injunction motion (DN 3), but granted CSX leave to amend its complaint (DN 11). The Defendants moved to dismiss the amended complaint on similar grounds (DN 13), but the Court denied that motion because the amended complaint adequately established jurisdiction on different grounds: diversity of citizenship under 28 U.S.C. § 1332. Order on Motion to Dismiss (DN 17).

2

## - The Disputed Property -

To illustrate the disputed boundary at trial, the parties introduced two surveys (Pl. Ex. 5, 6),³ screenshots from Google Maps (DN 20 at 5–6), several photos (Pl. Ex. 4), a "valuation map" from 1917 (Pl. Ex. 1), and a modern version of that map with overlaid "annotations" from CSX's Geographic Information Systems (GIS) mapping software (Pl. Ex. 2). While these exhibits help resolve the injunction request, a simpler consolidated image of the tracks and barricade fences exists on Google Maps. This image (captured by the Court and reproduced below) plainly demonstrates the relationships between the fences and tracks. While the Court arguably could take judicial notice of this "map," *see Livingston Christian Schools v. Genoa Charter Township*, 858 F.3d 996, 1008 (6th Cir. 2017) (taking judicial notice of maps generated by Google), that's unnecessary here. The opinion includes this figure for purely exemplary, not decisional, purposes. But the image is consistent with the surveys and valuation map that are part of the evidentiary record.

**Figure 1 (Google Maps):**



This figure (oriented north) shows the three tracks and three fences involved in this litigation. Three sets of track run northwest past Ware's silos: the "mainline track" in the center (covered here by a train), a "passing track" to the north alongside

---

³ CSX introduced two surveys from two different surveyors. Billy Ray Suiter originally prepared a "right of way survey" (Plaintiff's Trial Ex. 5), but he was unable to attend the trial. So James Adams "field checked" (and authenticated) Suiter's survey and generated his own very similar one (Plaintiffs' Trial Ex. 6). *See* Trial Tr. at 78:19–23.

Penchem Road (Highway 848), and the "sidetrack" to the south in between the mainline track and the Johnson-Graham property. The sidetrack ends just short of the easternmost of the Defendants' two barricade fences, which are both circled here in yellow. The southeast corner of the image shows part of a white vinyl fence that runs alongside part of Rosenwald Street. According to Adams's survey (Pl. Ex. 6), that vinyl fence ends approximately 34 feet from the center of CSX's mainline track. But CSX hasn't made it a focus of their request for injunctive relief—which seeks the removal of the two barricade fences.

## - Findings -

No one doubts that the barricade fences interfere with CSX's use of the land between the mainline track and the Johnson-Graham property to extend its sidetrack. Whether the law entitles CSX to an injunction against this interference depends on whether the Defendants had the right to place the fences as close as they did to the mainline track. Although the surveys and the 1917 valuation map refer to CSX's "right of way," which connotes a mere easement alongside the track (more on this below), CSX contends that a 19th-century statutory grant gives it outright ownership of 50 feet on either side of the mainline track's centerline. The Defendants, meanwhile, maintain that a deed traceable to the early 20th century gives them ownership of the land beginning 40 feet from the centerline.

The parties' legal positions regarding property ownership don't much matter, however, if the barricade fences stand within 40 feet of the centerline. If they do, then the fences encroach on land that CSX may use for the railroad. This is true even if the Defendants are right that they own the land beginning 40 rather than 50 feet from the centerline—because the barricade fences would reach even closer.

Do they? To answer that factual question, the parties' proof focused on three issues: (1) where to mark the center (or "centerline") of the railroad and (2) how far from that centerline CSX's control extends, and (3) whether the fences encroach on and interfere with CSX's control of that land. *See* CSX Pretrial Brief (DN 24); Defendants' Pretrial Brief (DN 28).

**1.** The first point quickly dropped out. CSX maintains that the center of its right of way is "the centerline of the main railroad track." CSX Pretrial Brief at 6. The Defendants initially countered that the center is found at "the mid-point between the two sets of tracks" (centerline and passing) that currently run along the Johnson-Graham property. Defendants' Pretrial Brief at 1. But they abandoned that position after two witnesses testified in support of CSX's understanding.

James Adams, a land surveyor, explained that a railroad's right-of-way is always measured "from the center line of the main track." Trial Tr. at 78:13–18; 79:21–80:3. And Elizabeth Harper, CSX's Manager of Title, testified that "the centerline of the main line track" is the standard measuring point for a railroad's right-of-way. Trial Tr. at 51:17–51:24. Although the parties offered no definitive legal authority on this point, CSX did cite at least some caselaw using and applying these terms in a manner consistent with its approach. *See France v. Chesapeake &*

4

*O.R. Co.*, 160 S.W. 757, 758 (Ky. 1913) (railroad right-of-way extended "fifty feet from the center of the original or main railroad track").

The Defendants offered no evidence or argument in rebuttal. In fact, counsel conceded that his clients lacked "a factual or a legal basis for" disputing the proper measuring point. Trial Tr. at 102:10–18.[4] So in measuring CSX's area of control, the Court will start from the center of the main track, not from the midpoint between the two existing tracks.

**2.** As for the second point, how far south of the main track does CSX control? This depends on a conflict between a statute and a deed.

The railroad says that an 1837 Kentucky statute gives it fee-simple ownership of 100 feet on either side, but concedes that CSX and its predecessors claimed only 50 feet.[5] This position rests on an 1837 statute granting railroads "good right and title" to property on which they built a line, "together with a space of one hundred feet on each side of the centre of said road." 1837 Ky. Acts, Chapter 231 (Pl. Ex. 3) § 35. Prior owners had five years from construction to apply for compensation, after which they were "forever barred from recovering the said land." *Id.*[6] And the General

---

[4] At trial both lawyers agreed that "the middle of the three tracks" that exist today—the track marked as the "mainline" on the surveys—is the one "laid to give the railroad the right to control or own the land on either side of that initial track." Trial Tr. 54:14–16, 55:2–4. Plaintiff's counsel represented that the "main line track that runs from Nashville to Henderson has always been the center track," and defense counsel agreed that "the middle of the three tracks here is the one that runs and presumably has always run between Nashville and Henderson." Trial Tr. at 53:25–54:2; 55:2–5. Given the parties' agreement, the Court has no reason to revisit this shared understanding. Although a note on the 1917 valuation map may have something to add on this point: the "[o]ld track which controls R/W runs almost coincident with passing tk. entire length." Plaintiff's Trial Ex. 1. Elsewhere, the map notes that "[w]idths of R/W refer to old ... track: – almost coincident with P.T." *Id.* Since no party or witness appears to have addressed these small notations at trial, neither will today's order.

[5] The Court's pretrial order asked each party to address "the source of its legal right to the disputed property, describ[e] the nature of that right, and addres[s] whether it has abandoned any portion of that right." DN 23. No party mentioned abandonment at trial. But CSX's property manager did speculate that the railroad may never have claimed half of its 100-foot statutory allotment in the first place. Trial Tr. at 61:5–8. That historical question wouldn't affect the injunction or the barricade fences, however, because they undoubtedly stand within 50 feet of the centerline.

[6] Section 36 purports to void any subsequent grant of land adjacent to the track: "All lands not heretofore granted to any person, nor appropriated by law to the use of the State, within one hundred feet of the centre of said road or its branches, which may be constructed by the said company, shall vest in the company, so soon as the line of the road is definitely laid out through it, and any grant thereafter shall be void."

Assembly deemed any interference with the railroad's use of this land a nuisance subject to abatement. § 39.[7]

But even if CSX's predecessors once owned 50 or 100 feet on either side of the railroad, that doesn't settle who owns it today. Though the statute in places uses language with a whiff of permanence—"…forever barred from recovering," § 35; "any grant thereafter…," § 36—no one has suggested the legislature rendered the land inalienable by vesting title in the railroad *in perpetuity*. And from the Defendants' perspective, CSX's predecessor must've transferred control of some of its land by at least 1915. That's because they have a deed that places the boundary of the Johnson-Graham lot closer to the centerline—only 40 feet away. According to the deed, their property begins "forty (40) feet South of the center of the L & N Railroad; thence parallel with said railroad and forty (40) feet from center of same…." Def. Ex. 1. The Defendants inherited the parcel in 1997, and defense counsel has traced this description of the boundary back to a 1929 deed that refers to an even older deed from 1915. *See* Trial Tr. 3:22–25, 15:2–9. But there the trail ends. No party has been able to locate any earlier deed or description—or any other legal document that might set down a more specific relationship between the Defendants' lot and the statutory grant of land claimed by the railroad. Trial Tr. at 15:25–16:1 (defense unable to trace title "all the way back until it touched the railroad").

Which legal instrument determines the property line: the older statute or the relatively newer deed? This raises a potentially prickly question of state property law. Would the existence of a deed imply an alienation of land granted by statute to CSX's predecessor, even in the absence of a contract or some other record or evidence addressing the boundary? Does CSX today have any basis to override, or even doubt, a deed that has—for a century—expressly marked a boundary by reference to the railroad's centerline?

Neither party has identified any caselaw addressing a similar situation. And the evidence they offer is scant and inconclusive. Harper, CSX's property manager, testified that the company's predecessor generally claimed less than 100 feet from the centerline—and speculated this was done to minimize property-tax obligations. *See* Trial Tr. at 62:21–24 (the railroad "didn't want to claim more and be taxed on more if they weren't utilizing it and taking it for business"). CSX pointed to a 1917 valuation map (Plaintiff's Trial Ex. 1, *see* DN 24-2) that marks the property line at 50 feet. Trial Tr. at 65:24–66:1. And another CSX map (Plaintiff's Trial Ex. 2) show a property line that runs under—or perhaps around; the lines are unclear—buildings that once stood between the track and the Johnson-Graham property. Confusingly, this last map suggests a boundary bouncing back and forth *between* 40 and 50 feet of the track. *See* Trial Tr. at 66:9–22; Plaintiff's Trial Ex. 2.

---

[7] Section 39 provides: "Every obstruction to the safe and free passage of vehicles on said road, or its branches, shall be deemed a public nuisance, and may be abated as such, by any officer agent, or servant of the company."

These questions are arguably implicated by CSX's quiet-title claim, which would (and may yet) require this Court to reconcile the statute and deed in a way that determines a specific property line. But despite the parties' considerable attention to this issue, the bench trial addressed only CSX's injunction request.

**3.** Deciding whether to grant an injunction requires the Court to determine only whether the Defendants' fences interfere with property available to CSX for railroad use. The answer to that question is clearly yes. And it's a direct function of the Defendants' concession on question one above. Once the railroad's area of control is understood to extend at least 40 feet from the center line, the surveys make plain that the fences extend within that space.

At the trial, the testifying surveyor (Adams) presented a survey (Pl. Ex. 5, included as Figure 2) showing the two barricade fence sections marked in red and three potential boundary lines marked in green, blue, and yellow.

The green line runs 50 feet from the center of the mainline track. This is CSX's proposed property line. The survey describes it as "existing CSX R.O.W. 50' from the center of the main line track." Pl. Ex. 5. The fences fall completely within this area.

What about the Defendants' proposed boundaries?

A blue line runs 40 feet from the center of the mainline track. The survey describes it only as "top of cut slope." *Id.* The 40-foot distance is consistent with the deed's reference to a lot beginning "40 feet from center of the L & N Railroad." Defendants' Pretrial Brief at 1. As discussed above, the center of the railroad refers to the center of the mainline track, not the midpoint between the main and passing tracks. And the fences likewise reach (almost entirely) within this proposed boundary.

A third line, marked in yellow, tracks the Defendants' proposed 40-foot line as measured from "the mid-point between the two sets of tracks." *Id.* The survey labels that line as the "property line as apparently marked by others." Pl. Ex. 5. It would place the fences—and, equally important, the proposed sidetrack extension—on land belonging to the Defendants. But the Court has rejected and the Defendants have abandoned the contention that the lot should be measured from midpoint.

So regardless of whether the Court adopts the CSX proposal or the 40-foot line that the Defendants haven't abandoned, the fences stand on land that is not owned by the Defendants. Indeed, Adams testified that the two barricade fences sit "maybe 20 feet or so" from the center of main line, Trial Tr. at 87:2–8, and at least one segment (perhaps two) of the white vinyl fence extends past the Defendants' argued property line, Pl. Ex. 5. The Defendants offered no evidence to rebut the Adams survey or testimony. Nor have they offered any argument that CSX doesn't control the land between the Johnson-Graham property and the existing tracks. So they are left without any plausible measurement or interpretation that would place the fences on their property. The Court therefore finds that the Defendants' fences extend beyond their property and onto CSX's.

**Figure 2 (Suiter Survey, Pl. Ex. 5):**



- **Conclusions of Law** -

Given these factual findings, the nature of CSX's interest in the land on which the fences sit—that is, whether it owns the land or merely possesses a right of way— is ultimately immaterial to the company's request for injunctive relief. An injunction against the Defendants' interfering fences is justified regardless.

CSX insists that it has "*fee* ownership" (outright ownership of the land) "of the underlying right of way," which it traces back to the 1837 Kentucky statute granting railroads "good right and title" to property on which they built a line. CSX Pretrial Brief at 2; 1837 Ky. Acts, Chapter 231 § 35. If CSX owns a fee interest in the land, its entitlement to relief turns on whether the Defendants trespassed—that is, "intru[ded] or encroach[ed]" upon CSX's land without authorization. *See Smith v. Carbide and Chemicals Corp.*, 226 S.W.3d 52, 54 (Ky. 2007).

But CSX's assertion of ownership sits in tension with the "presumption" within Kentucky caselaw "that a railroad acquired a right-of-way easement—and not a fee— to construct its roadbed." *Abbott, Inc. v. Guirguis*, 626 S.W.3d 475, 486 (Ky. 2021). True, the Kentucky Supreme Court's decision in *Abbott* doesn't discuss the 1837 statute that CSX relies on—and instead relies on precedent emphasizing the "common knowledge that a railroad company ordinarily needs only an easement in

8

order to construct and maintain its roadbed." *Illinois Central R. Co. v. Roberts*, 928 S.W.2d 822, 825 (Ky. App. 1996) (citing *Sherman v. Petroleum Exploration*, 132 S.W.2d 768, 772 (Ky. App. 1939)). And the *Abbott* decision acknowledges that the presumption exists only "in the absence of evidence to the contrary." 626 S.W.3d at 486. But in this case no such evidence exists: CSX hasn't introduced any proof regarding its predecessor's construction of the track, recording of its ownership interests, arrangements with any prior landowners, or claim of 50 rather than 100 feet from the track. *See Illinois Central R. Co.*, 928 S.W.2d at 826 (A "conclusive presumption in favor of a right-of-way easement" is "most tenable where, as here, there are no deeds of original conveyance or any other evidence bearing upon the initial authorization to lay the line."). And other evidence in the record—including CSX's own surveys—refer to CSX's "right of way."

One definition for "right-of-way" is "[t]he right to build and operate a railway line or a highway *on land belonging to another*, or the land so used." *Right-of-Way*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added). As commonly used, including by the Kentucky Supreme Court in *Abbott*, this refers to an "easement." 626 S.W.3d at 486. "[I]n its legal and generally accepted meaning, in reference to a railway, it is a mere easement in the lands of others, obtained by lawful condemnation to public use or by purchase." *Right-of-Way*, BLACK'S LAW DICTIONARY (12th ed. 2024) (quoting 1 Clinton P. Frick, *Abstract and Title Practice* § 118, at 106 (2d ed. 1958)).

If all the railroad has is an easement, entitlement to relief turns on whether the Defendants "unreasonably interfere[d] with the right of the holder of the easement." *Commonwealth, Dept. of Fish and Wildlife Resources v. Garner*, 896 S.W.2d 10, 14 (Ky. 1995).

The difference doesn't matter for present purposes because the Defendants haven't resisted the allegation that their fences interfere with CSX's efforts to utilize the property. Nor have they maintained (indeed they likely couldn't) that this interference is somehow "reasonable"—given that the only apparent reason for these two fence sections is to block sidetrack construction. And as discussed above, the fences unquestionably intrude or encroach within 40 feet of the centerline. So their presence would constitute a trespass if CSX owns the property outright rather than merely holding an easement. *See Smith*, 226 S.W.3d at 54. Either way, the Defendants' fences are unlawful.

Though that question of rights turns on state law, federal law determines CSX's remedy. "State law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's courts." *Guaranty Trust Co. v. York*, 326 U.S. 99, 106 (1945). "State law does not govern the scope of the equity powers of the federal court; and this is so even when state law supplies the rule of decision." *Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc.*, 646 F.2d 800, 806 (2d Cir. 1981). Regardless of whether state courts would grant an injunction on these facts, this court may do so only if it is consistent with "the traditional scope of equity." *Guaranty Trust Co.*, 326 U.S. at 105.

9

To obtain an injunction, therefore, CSX must satisfy "the four-factor test historically employed by courts of equity." *eBay Inc. v. MerchExchange, LLC*, 547 U.S. 388, 390 (2006). Under that test, a "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 391.

All those elements are satisfied on this record.

First, "a continuing trespass or occupation of real property can, in and of itself, constitute irreparable harm," as "a number of courts reviewing this issue have found." *Golf Village North LLC v. City of Powell*, 333 F. Supp.3d 769, 781 (S.D. Ohio 2018) (collecting cases); *see also United States v. Zenon*, 711 F.2d 476, 478 (1st Cir. 1983) ("A court has power to enjoin a trespass … if there are *repeated* instances of trespassing, and a single injunction might forestall a multiplicity of legal actions." (quotation marks omitted)). The Defendants' trespass-by-fence is of course continuous and twofold.

Second, legal remedies would not adequately compensate CSX's injury. That is because CSX "cannot recover damages for harm that has not yet occurred (*i.e.*, the future presence of the unwanted structure on Plaintiff's land), even though its occurrence is certain." *United States v. Western Radio Services Co.*, No. 3:11-cv-638, 2013 WL 1867477, at *1 (D. Oregon May 3, 2013). As in other trespass cases, "[n]o adequate legal remedy exists for" the Defendants' "trespass because ... Plaintiff has unsuccessfully attempted, multiple times, to have Defendant[s] remedy [this] violation." *Tennessee Valley Authority v. Walcott*, 611 F. Supp. 3d 1328, 1345 (N.D. Ala. 2020) ("No adequate legal remedy exists for Defendant's … trespass because … Plaintiff has unsuccessfully attempted, multiple times, to have Defendant remedy his violation."). By now, "[t]he generally accepted modern rule is that equity has jurisdiction to grant relief against repeated trespasses on the theory that successive legal actions for monetary damages do not provide adequate relief." *Newfound Management Corp. v. Lewis*, 131 F.3d 108, 115 (3d Cir. 1997). And it's hard to imagine how CSX could be made whole, given its commitment to service Ware with an extended sidetrack, if it had to return to the courthouse for damages any time the Defendants again interfered with the track in this way.

Third, the balance of hardships favors CSX. The fences damage its relationship with Ware by blocking the sidetrack extension. Amended Complaint ¶¶ 39–43. The Defendants, by contrast, haven't offered any evidence or argument in support of their fence—other than their obvious preference that another line of track not abut their property. Absent some good reason for the fences, they "ha[ve] no legitimate interests in the location of the structure, located as it is … on someone else's land" (or at least land that someone else has a right to use for railroad track). *Western Radio Services Co.*, 2013 WL 1867477, at *2 (emphasis omitted).

Last, the public interest would be served by an injunction requiring the Defendants to remove fences they had no right to build in the first place. "Clearly, it is not against the public interest to prevent further trespass in contravention of the state's laws." *O'Connor v. Smith*, 427 F. App'x 359, 367 (5th Cir. 2011).[8]

What about the scope of the injunction due CSX? The company seeks both a mandatory injunction to "remove the barricade fencing" and a prohibitory injunction to "refrain from any further activities which would interfere with the construction of the sidetrack extension or otherwise interfere with CSXT's railroad operations." Amended Complaint ¶ 45.[9] The barricade fences undoubtedly are permanent structures that interfere with the sidetrack construction. So CSX is due a mandatory injunction compelling the Defendants to remove the barricade fences regardless of whether it owns the property outright or merely holds an easement. *See United States v. Newcome*, No. 2:04-cv-650, 2005 WL 2230205, at *5 (S.D. Ohio Sept. 12, 2005) (granting injunction to remedy interference with easement); *United States v. Bundy*, No. 2:11-cv-804, 2013 WL 3463610, at *2–3 (D. Nev. July 9, 2013) (same regarding trespass).[10]

---

[8] This outcome would not differ under state law. A "continued" trespass resulting from a permanent structure (such as a fence) gives the injured party "the right of election between two remedies—a proceeding by injunction to remove or abate the wrong complained of, or an action at law to recover damages for the injury sustained." *Cumberland Tel. & Tel. v. Barnes*, 101 S.W. 301, 302 (Ky. 1907) (affirming a "mandatory injunction to remove the incumbrances"). Under Kentucky caselaw, being "deprived of the use and enjoyment of [one's] land" constitutes an "irreparable injury" that has "no adequate or complete remedy at law." *Burgin v. Forbes*, 169 S.W.2d 321, 323 (Ky. 1943); *see also Barnes*, 101 S.W. at 302 ("[A] complete remedy … can only be obtained by invoking the power of the court by process of mandatory injunction to remove the incumbrances that have been placed upon the property."). And an injunction to avoid "a multiplicity of suits" for damages certainly serves an equitable purpose consistent with the public interest. *Id.* The same holds true when a property owner or neighbor interferes with another's lawful use of an easement. *See, e.g.*, *Horky v. Kentucky Utilities Co.*, 336 S.W.2d 588, 589 (Ky. 1960); *Studer v. Jackson*, No. 2009-CA-267, 2010 WL 1628213, at *1 (Ky. App. Apr. 23, 2010).

[9] A "mandatory injunction" is "[a]n injunction that compels a party to do some act or mandates a specified course of conduct." *Injunction*, BLACK'S LAW DICTIONARY (12th ed. 2024). Whereas a prohibitory injunction "forbids or restrains an act." *Id.*

[10] CSX's papers and presentation at trial did not focus on any portion of the white vinyl fence that might interfere with the sidetrack construction. *See* Amended Complaint ¶ 8 (seeking injunction ordering the Defendants to "remove the barricade fencing" without reference to the white vinyl fence); PI Reply (DN 20) at 1 (seeking "injunction ordering the Defendants to remove the trespassing barricade fencing and to prevent the Defendants from further interfering with CSXT's railroad operations"); *but cf.* CSX Pretrial Brief at 5 (indicating that the end of "a white vinyl fenceline ... also extends into the Railroad Property," but not stating whether it would interfere with sidetrack project); Trial Tr. at 79:7–10 (noting that "white picket fence also infringe[s] upon or is ... within the 50-foot right-of-way," but not

11

Is a prospective "prohibitory" injunction also necessary to guard against continued interference with CSX's property rights?  Probably not.  CSX has not presented any evidence or argument that—despite this Court's ruling—the Defendants would again interfere with its construction efforts once the fences are gone.  And defense counsel stated at trial that if the Court were to find that the fences were "across the boundary line and on the railroad's property," the Defendants would "abide by and respect" that decision.  Trial Tr. at 21:3–5.  Given the absence of evidence that Defendants are likely to interfere with CSX's use of this land in the future, the Court declines to impose more onerous forward-looking restrictions at this time.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").

### ORDER

Consistent with Federal Rule of Civil Procedure 65(d), the Court orders the Defendants to remove the barricade fencing, orders counsel to confer in good faith regarding the appropriate next steps in this litigation—including the status of CSX's quiet-title claim and the Defendants' counterclaims—and orders the parties to file a joint status report on that and the remaining claims and counterclaims within 30 days.

Benjamin Beaton, District Judge
United States District Court

July 31, 2024

---

clearly asking the Court to order its removal).  If the parties believe the reasoning included in this order implicates a portion of the fence along Rosenwald Street, they should confer and raise any modifications or disagreements in their status report.